# United States District Court

### FOR THE DISTRICT OF COLUMBIA

**In the Matter of the Search of:**

The work office of Thomas Drake, located at
National Defense University, Eisenhower Hall, Rm. 332,
408 4ᵗʰ Avenue, Fort McNair, Washington, D.C. 20319

## SEARCH WARRANT

**CASE NUMBER:** 0 7 - 5 7 3 - M - 0 3

TO: _____Christine A. Botz_____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____Christine A. Botz_____ who has reason to
Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

work office of Thomas Drake, located at National Defense University, Eisenhower Hall,
408 4ᵗʰ Avenue, Fort McNair, Washington, D.C. 20319

> See Attachment A, incorporated herein by reference as if fully restated herein.

in the District of _____Columbia_____ there is now concealed a certain person or property, namely:

> See Attachment B, incorporated herein by reference as if fully restated herein.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for
the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before   *within 10 days* *Joh M. Garcia* *11/21/07*
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making
the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been
established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person
or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the
undersigned U.S. Judge or Magistrate as required by law.

**NOV 21 2007**

Date and Time Issued   **JOHN M. FACCIOLA**
**U.S. MAGISTRATE JUDGE**

Name and Title of Judicial Officer

at   Washington, District of Columbia_____
City and State

*Joh M. Facciola*
Signature of Judicial Officer

**JOHN M. FACCIOLA**
**U.S. MAGISTRATE JUDGE**

AO 106 (Rev. 7/87) Affidavit for Search Warrant ⊛

# United States District Court

## DISTRICT OF COLUMBIA

In the Matter of the Search of:

The work office of Thomas Drake, located at
National Defense University, Eisenhower Hall, Rm. 332,
408 4th Avenue, Fort McNair, Washington, D.C. 20319

**07 - 573 - M - 03**

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

#### CASE NUMBER:

I _____ **Christine A. Botz** _____ , being duly sworn, depose and

say:

I am a(n) **Special Agent of the Federal Bureau of Investigation** _____ and have reason to believe
                                    Official Title

that ☐ on the person of or ☒ on the property or premises known as:

**See Attachment A, Incorporated herein by reference as if fully restated herein.**

in the District of _____ **Columbia** , there is now concealed a certain person or property, namely:

**See Attachment B, Incorporated herein by reference as if fully restated herein.**

Which is:

property that constitutes evidence of the commission of a criminal offense against the United States
concerning a violation of Title ___ **18** ___ United States Code, Section(s) ___ **371, 793, and 798** .

The facts to support a finding of Probable Cause are as follows:

**See Attached Affidavit In Support of Search Warrant, hereby incorporated by reference as if fully
restated herein.**

Continued on the attached sheet and made a part hereof.        ☒ Yes        ☐ No

_SA Christine A. Botz_
_____
Signature of Affiant
**Special Agent**
**Federal Bureau of Investigation**

Sworn to before me, and subscribed in my presence

**NOV 21 2007** _____ at        Washington, District of Columbia _____
                                            City and State
**JOHN M. FACCIOLA**
**U.S. MAGISTRATE JUDGE**                   _John M. Facciola_
_____             _____
Name and Title of Judicial Officer          Signature of Judicial Officer

**JOHN M. FACCIOLA**
**U.S. MAGISTRATE JUDGE**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, CHRISTINE A BOTZ, being duly sworn, depose and state as follows:

## I.     INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and am assigned to the Washington Field Office in the District of Columbia. I am assigned to a Counterintelligence Squad which investigates crimes involving national security. I have been an FBI Special Agent for approximately four years, have completed FBI training in the proper handling of classified information, and have been involved in the execution of search warrants and seizing evidence from residences and other locations.

2.      I am currently assigned to a task force that is conducting an investigation into the unauthorized disclosure, or "leak," of classified information to two New York Times ("NYT") reporters, James Risen and Eric Lichtblau, who work in the NYT's Washington, D.C. Bureau, concerning alleged activities of the National Security Agency ("NSA"), including the Terrorist Surveillance Program ("TSP"). The investigation concerns potential violations of Title 18, United States Code (U.S.C.), Sections 793 (Unlawful Disclosure of Classified National Defense Information), 798 (Unlawful Disclosure of Classified Information) and 371 (Conspiracy To Commit an Offense Against The United States). As detailed below, the investigation to date has established probable cause to believe that William Edward Binney ("Binney"), Diane Sue Roark ("Roark"), Edward Francis Loomis ("Loomis"), John Kirk Wiebe ("Wiebe"), and Thomas Andrews Drake ("Drake"), have without authorization removed and retained classified documents or materials at an unauthorized location, or created documents from memory that contained classified information in unauthorized space, that is, their

respective homes, and disclosed such information to other persons not authorized to receive it, including at least one member of the media.

3.      This affidavit is made in support of an application for a warrant authorizing:   the search of the residence of Drake, located at ████████████, Glenwood, Maryland, 21738 (described more fully in Attachment A); the search of the work office of Drake, located at National Defense University, Eisenhower Hall, 408 4th Avenue, Fort McNair, Washington, D.C. 20319 (described more fully in Attachment B); and the search of Drake's vehicle, a 2006 Toyota Hybrid Prius (described more fully in Attachment C); and the seizure of classified information and/or evidence establishing Drake's unauthorized removal, retention, and/or disclosure of classified documents or materials, in violation of one or more of the aforementioned statutes. A listing of items to be seized at the locations is described in Attachment D.

4.      The facts set forth in this affidavit are those personally known to me, or communicated to me by other FBI Special Agents and personnel with knowledge of this investigation. Since this affidavit is being submitted for the limited purpose of securing this search warrant, I have set forth only those facts which I believe are necessary to establish probable cause to believe that fruits, instrumentalities and/or evidence of the above-specified offences will be located at the aforementioned premises.

## II.    BACKGROUND

### A.    The Attacks of September 11 and the Terrorist Surveillance Program

5.      On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were

2

hijacked by al Qaeda operatives. Two of the jetliners were targeted at the Nation's financial center in New York and were deliberately flown into the Twin Towers of the World Trade Center. The third was targeted at the headquarters of the Nation's Armed Forces, the Pentagon. The fourth was apparently headed toward Washington, D.C., when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was evidently the White House or the Capitol, strongly suggesting that its intended mission was to strike a decapitation blow on the Government of the United States – to kill the President, the Vice President or Members of Congress. The attacks of September 11 resulted in approximately 3,000 deaths, the highest single-day death toll from hostile foreign attacks in the Nation's history. The attacks shut down air travel in the United States, disrupted the Nation's financial markets and government operations, and caused billions of dollars in damage to the economy.

6.    On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept. 14, 2001). The same day, Congress passed a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11, which the President signed on September 18. Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (Sept. 18, 2001) (reported as a note to 50 U.S.C.A. § 1541). Congress also expressly acknowledged that the attacks rendered it "necessary and

3

appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and in particular recognized that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl. Congress emphasized that the attacks "continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." *Id.* The United States also launched a large-scale military response, both at home and abroad. In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002. The United States also immediately began plans for a military response directed at al Qaeda's base of operations in Afghanistan. Acting under his constitutional authority as Commander in Chief, and with the support of Congress, the President dispatched forces to Afghanistan and, with the assistance of the Northern Alliance, toppled the Taliban regime.

7.       Against this unfolding background of events in the fall of 2001, there was substantial concern that al Qaeda and its allies were preparing to carry out another attack within the United States. Al Qaeda had demonstrated its ability to introduce agents into the United States undetected and to perpetrate devastating attacks, and it was suspected that additional agents were likely already in position within the Nation's borders. To counter this threat, the President authorized the NSA to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations. Press Conference of President Bush (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-2.html.    This activity – which subsequently was identified as the Terrorist Surveillance Program (TSP) – was

4

"critical" to national security and was designed to establish an early warning system to detect and prevent another catastrophic terrorist attack on the United States. Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html.

**B.      The Unauthorized Disclosure Of Classified Information Concerning The TSP**

8.      In early October 2004, James Risen contacted Public Affairs officials in the Office of the Vice President, the National Security Council, the Central Intelligence Agency ("CIA") and the NSA about a news article he was writing. The Public Affairs officials and other high-ranking Executive Branch officials have confirmed that during the ensuing days, Risen engaged in a series of email communications, conversations and meetings with the officials regarding the story. In substance, Risen represented that he had obtained information about a warrantless electronic surveillance program that he said was known to only a few officials within the United States Government. Ultimately, Risen's inquiries led to a meeting on October 25, 2004, at The White House, involving other representatives of The New York Times and high-ranking Executive Branch officials. This was followed by another meeting about ten days later at the Department of Justice involving Risen, Lichtblau, a third NYT representative, and several high-ranking Executive Branch officials. Subsequent to this meeting, NYT representatives elected not to publish Risen's story without first conferring further with the high-ranking Executive Branch officials. As a result, no story regarding the TSP was published in 2004.

9.      Approximately one year later, in the fall of 2005, NYT representatives again contacted high-ranking Executive Branch officials and advised that they were considering publishing the story. In that regard, it was represented that additional

"sources" had come forward and raised concerns about the surveillance activities. A number of meetings ensued between representatives of the NYT, high-ranking Executive Branch officials, and Members of Congress. Despite these ongoing discussions, the NYT published its story on its website the evening of December 15, 2005. The story, titled *Bush Lets U.S. Spy on Callers Without Courts*, was authored by Risen and Lichtblau and appeared in the next day's edition of the newspaper. This article was followed by a series of NYT articles, written or co-authored by Risen and/or Lichtblau describing a range of alleged NSA activities and related circumstances, including:

     a.    *Spy Agency Mined Vast Data Trove, Officials Report*, Dec. 24, 2005, by James Risen and Eric Lichtblau;

     ·b.    *Defense Lawyers in Terror Cases Plan Challenges Over Spy Efforts*, Dec. 28, 2005, by James Risen and Eric Lichtblau;

     c.    *Justice Deputy Resisted Parts of Spy Program*, Jan. 1, 2006, by James Risen and Eric Lichtblau; and

     d.    *Spy Agency Data After Sept. 11 Led FBI to Dead Ends*, Jan. 17, 2006, by Lowell Bergman, Eric Lichtblau, Scott Shane and Don Van Natta, Jr.

10.    In early January 2006, Risen published a book, titled State of War: The Secret History of the CIA and the Bush Administration. Chapter 2 of the book was entitled, "The Program," and dealt entirely with alleged NSA activities, including the warrantless surveillance program described in the Risen and Lichtblau articles.

11.    Since publication of the aforementioned articles and book, there have been numerous additional stories in various media, including but not limited to newspapers, magazines, television, radio and the internet, regarding the TSP and related matters. As

6

set forth below, one such article, which appeared in The Baltimore Sun in May 2006, titled *NSA Rejected Systems That Sifted Phone Data Legally*, by Siobhan Gorman, suggests that one or more of the five subjects discussed herein disclosed highly classified information concerning the NSA and its activities, sources and methods, to unauthorized persons.

### III.   INVESTIGATION OF THE LEAK OF CLASSIFIED INFORMATION CONCERNING THE TSP

12.     Shortly after the first TSP article, in late December 2005, the DOJ and the FBI initiated an investigation concerning the unauthorized disclosure of classified information contained in that article.  That investigation has been continuing since that time and has involved interviews of in excess of 1,000 individuals, issuance of more than 200 grand jury subpoenas, principally for telephone and email records, and review of thousands of pages of documents, including telephone and email records for approximately 60 individuals.

### A.   Background Regarding Five Subjects Of The Investigation

13.     Through that process, the following individuals, among others, have been identified as subjects of the investigation: (a) William Binney, a former senior operations officer for the NSA, who now resides in Severn, Maryland; (b) Diane Roark, a former staff member on the U.S. House of Representatives Permanent Select Committee on Intelligence (HPSCI), who now resides in Stayton, Oregon; (c) Edward Loomis, a former cryptologic computer scientist at NSA, who now resides in Baltimore, Maryland; (d) John Wiebe, a former acting division chief at NSA, who now resides in Westminster, Maryland; and (e) Thomas Drake, a current NSA Senior Executive Staff member, who now resides in Glenwood, Maryland.

14.     Binney is a former senior operations officer for the NSA who retired on October 31, 2001, after 36 years of service.  Since 2004, Binney has worked as a contractor for the NSA and, until July 26, 2007, had entered NSA facilities approximately two times a year.  After retiring, Binney started a three-person contracting firm on December 3, 2001, with Loomis and Wiebe.  The company is called Entity Mapping LLC (Entity).  According to Binney, the company has done work for NSA, Boeing, and the Department of Homeland Security.  In addition to being a partner in Entity, Binney worked for Eagle Alliance from October 2001 to October 2002; Zytel Corporation (General Dynamics sub-contractor) from November 22, 2002, to May 5, 2004; Diversified Development Corporation from July 2002 to the present; and Entegra Systems, Inc. from October 2005 to the present.  While working at the NSA, Binney was the program manager of a program called "THIN THREAD."  Additionally, he had regular contact with Roark while she was serving as a HPSCI staff member.  At no time during or subsequent to his employment at the NSA has Binney been authorized to possess NSA classified documents or data at his home or on his personal computer.

15.     Roark is a former Congressional staff member who worked for seventeen years on the HPSCI until she retired in April 2002.  At the HPSCI, Roark assisted in oversight of various compartmentalized intelligence programs at the NSA, as well as related Congressional budget approval issues.  After Roark left the HPSCI, she stayed in the Washington, D.C., area until early 2003, when she moved to Oregon.  At no time during or subsequent to her service on the HPSCI has Roark been authorized to possess NSA classified documents or data at her home or on her personal computer.

16.     Loomis is a former cryptologic computer scientist for the NSA who retired in November 2001 after ~~twelve~~ *thirty-seven (37)* years of service. Since the end of 2002, Loomis has worked as a contractor for the NSA and, until July 26, 2007, entered NSA facilities on a regular basis. After retiring, Loomis started Entity, the above mentioned three-person contracting firm, with Binney and Wiebe. The company's corporate headquarters is located at 515 Overdale Road, Baltimore, Maryland, which is also Loomis' home address. In addition to being a partner in Entity, Loomis worked for Eagle Alliance from November 2001 to October 2002; GTE Tactical Systems (General Dynamics sub-contractor) from November 2002 to present; and Diversified Development Corporation from October 2002 to the present. At no time during or subsequent to his employment at the NSA has Loomis been authorized to possess NSA classified documents or data at his home or on his personal computer.

17.     Wiebe is a former acting division chief for the NSA who retired in October 2001 after approximately 26 years of service. After Wiebe retired from the NSA, he continued to work as a contractor for the NSA and, until July 26, 2007, regularly entered NSA facilities. On December 3, 2001, Wiebe started Entity with Binney and Loomis. In addition to being a partner in Entity, Wiebe worked for Eagle Alliance from October 2001 to November 2002; Diversified Development Corporation from September 2002 to the present; and GTE Tactical Systems (General Dynamics sub-contractor) from April 2003 to present. At no time during or subsequent to his employment at the NSA has Wiebe been authorized to possess NSA classified documents or data at his home or on his personal computer.

18.   Drake was hired at NSA as the Chief of the Signal Intelligence Directorate (SID) Change Leadership and Communications Office on September 10, 2001. Prior to being hired at NSA, Drake was acquainted with Roark through professional affiliations, and was employed at Booz Allen Hamilton and Integrated Computer Concepts Inc. as a fully cleared NSA contractor. In August 2006, Drake began working as the NSA Chair for the Industrial College of the Armed Forces (ICAF), National Defense University (NDU), Fort McNair, Washington, D.C. At no time during his employment at the NSA has Drake been authorized to possess NSA classified documents or data at his home or on his personal computer.

19.   On July 26, 2007, search warrants were executed at the residences of Binney, Wiebe, and Roark, and a consent search was executed at the Loomis residence. A District of Maryland search warrant was obtained for Loomis' home computer(s), but was not executed as Loomis consented to a search of his home, as well as his home computer.[1]  As described more fully below, this request for issuance of search warrants relating to Drake is based, in part, on evidence obtained during the Binney, Wiebe and Loomis searches.

**B.**   **The Subjects' Unlawful Disclosure Of Classified NSA Information**

    **1.**   **Roark, Binney And Wiebe Disclose The TSP To Unauthorized Persons**

20.   According to NSA officials who have been interviewed in connection with

---

[1] On July 25, 2007, the U.S. Magistrate Judge on duty at the U.S. District Court for the District of Maryland approved search warrants for the residences of Wiebe (case no. 07-2351 JKS) and Binney (case no. 07-2352 JKS) and sealed the application materials. The next day, the court authorized a search warrant for the computer(s) located in  Loomis's home (case no. 07-2360 JKS) and sealed the affidavit. On July 25, 2007, the U.S. Magistrate Judge on duty at the U.S. District Court for the District of Oregon approved a search warrant for the residence of Roark (case no. 07MC9169-A) and similarly sealed the affidavit. All of the search warrant applications remain sealed.

this investigation, in the mid to late 1990s, Binney, Loomis and Wiebe worked on several programs that collected and analyzed data at the NSA. One of these collection programs, which Binney claimed during an FBI interview that he developed,[2] was called THIN THREAD. According to Binney, THIN THREAD was a pre-cursor to the TSP. Moreover, Binney believed that THIN THREAD was less costly to implement and operate than the TSP, and believed that it included encryption features purportedly designed to address perceived privacy concerns associated with NSA activities.

21.    After 9/11, Binney, Wiebe, and Loomis immediately started packaging THIN THREAD as a solution to some of the data sorting problems exposed by what they perceived as the "collect now, analyze later" way of doing business at the NSA. Similarly, review of Drake's classified email from 2001 forward shows that Drake shared their view, was pushing NSA senior officials to keep THIN THREAD operational and funded, and was reporting back to Binney, Wiebe, and Loomis (now former NSA employees) on sensitive NSA information being discussed in the high-level NSA meetings he was attending.

22.    Both before and after 9/11, Binney, as the THIN THREAD project manager, provided Roark, as the HPSCI staff member with NSA responsibilities, with information regarding THIN THREAD. According to Binney, Roark was a strong proponent of the THIN THREAD program and worked hard to ensure that it was funded. However, according to Binney and several other NSA employees who were interviewed during this investigation, Roark did not have an accurate understanding of THIN

---

[2] Binney has been interviewed by the FBI on three occasions during this investigation: October 19, 2006, March 21, 2007, and June 28, 2007. Additionally, Binney made additional statements to the FBI on July 26, 2007, during the court-authorized search of his residence. Unless otherwise noted, the statements attributed to Binney in this affidavit were made during one or more of three interviews, not in connection with the July 26 search.

11

THREAD and believed it was both a collection and an analysis program (as opposed to a collection program alone).

23.    Binney explained to the FBI that after 9/11, the NSA decided to scale back the THIN THREAD program. By his own admission, Binney was extremely upset about this decision. Moreover, at or about the same time, Binney learned that the TSP was being implemented. Significantly, Binney admitted that he was never "read in" to the TSP program – that is, he was never authorized to receive information concerning the program. He also has admitted, however, that he learned of its existence, its covername (which remains unpublished today) and its basic outlines, from an NSA contractor who was not authorized to provide Binney this classified information.

24.    Binney advised the FBI that because he was upset at NSA's decision to scale back THIN THREAD in favor of the TSP, he went to Roark, his contact on the HPSCI. According to Binney, in late 2001, while Roark was still with the HPSCI, Binney met her at her home in Hyattsville, Maryland, outside of normal channels and in an unsecure facility, and told her what he knew about the TSP, a highly classified program. According to NSA officials, Roark also had not been read in to the TSP (indeed, she has never been read in). Nevertheless, Binney informed the FBI that he and Roark then discussed various actions they could take to bring their concerns about the TSP to the attention of people within and outside the United States Government.

25.    According to Binney, one step that he and Roark took was to disclose the existence of the TSP to Dale Griffiths, another NSA contractor who, according to NSA officials, was not read in to the TSP. According to Binney, Griffiths was a friend of the daughter of a U.S. Supreme Court Justice, and Binney and Roark hoped that Griffiths

could facilitate a meeting with the Justice through the daughter. Binney told the FBI that this effort failed. Binney further stated that at or about the same time, Roark told him that she had called the presiding judge of the Foreign Intelligence Surveillance Court (FISC), Judge Colleen Kollar-Kotelly, to arrange a meeting; however, after an exchange of telephone calls with a court secretary, Roark was told to convey any concerns she had to the DOJ.

26.     According to Binney, in late 2001 or early 2002, Roark arranged for him and Wiebe to brief a member of the HPSCI about the TSP. According to NSA officials, that member was not read in to the TSP. Roark also told Binney that she went to the Chairman of the HPSCI, who was read in to the TSP, to discuss the TSP. According to the Chairman, who has been interviewed during the investigation, he told Roark to speak with General Michael Hayden, then the Director of the NSA, regarding her concerns. According to Binney, Roark told him that she spoke with General Hayden regarding her concerns about the TSP, as well as her belief that THIN THREAD was a superior program. Roark subsequently told Binney that as far as she was aware, no action was taken by the NSA after her discussion with General Hayden.

### 2.   Binney, Roark, Loomis, Wiebe and Drake Disclose Classified NSA Information Without Authorization

27.     During his interview(s) with the FBI, including an interview on July 26, 2007 when the search warrant was executed at his residence, Binney stated that in 2002, after he had left the NSA, he, Roark, Loomis and Wiebe created a thirteen-page summary of the THIN THREAD technology on his home computer. The idea to create the document originated with Roark, who wrote the first draft. According to Binney, he, Wiebe, and Loomis subsequently wrote technical parts of the summary which the four

subjects then emailed back and forth to one another from their home computers. The investigation has further determined that Drake was copied on those emails and, at a minimum, was involved in reviewing drafts of the summary. The subjects wrote the document as part of their effort to market technology solutions to potential customers, including government agencies, in connection with their fledgling contracting business, and to memorialize their views regarding the superiority of THIN THREAD vs. the TSP.

28.    During his FBI interviews, Binney stated that when the final summary was completed in May 2002, Binney and Loomis, who are not NSA classification authorities, and were not even NSA employees at the time, conducted their own "classification review" and decided that the document was unclassified. Notably, Binney stated that no effort was made to submit the THIN THREAD summary for classification review by appropriate authorities at the NSA. Binney told the FBI that they based their decision not to submit the document for classification review on their view that there was "far worse" on the internet as other contractor firms were far more open with their information than was the THIN THREAD summary and, if it was acceptable for other firms to be open about their classified or sensitive information, it was acceptable for them.

29.    On March 25, 2007, after his Binney's second FBI interview, Binney voluntarily emailed to the FBI the thirteen-page THIN THREAD summary which he originally had helped create in 2002. On May 10, 2007, the FBI provided that document to the NSA and requested that it conduct a thorough classification review of the summary. On June 26, 2007, NSA officials advised the FBI that the THIN THREAD summary is a classified document at the TOP SECRET level. As noted herein, this document was created, edited and emailed by and between Binney, Roark, Loomis,

14

Wiebe, and Drake. Thus, it appears that a TOP SECRET document, classified drafts of the document, and/or classified information contained in or relating to the document and THIN THREAD, were and are located on or in the personal computers, email accounts, and/or residence of Drake.

30.    This is further corroborated by the results of the search of Binney's residence on July 26, 2007. At that time, two documents were seized which established that Roark had emailed the classified THIN THREAD summary to Loomis, Wiebe, Binney, and Drake on May 31, 2002. These documents were sent to Drake at ████████@earthlink.net, his personal email address, and the document so transmitted contained information that the NSA has classified as TOP SECRET. As stated above, Drake is not authorized to have classified information in his home, his personal computer, and/or in his personal email account. Additionally, Drake's contact information was located in Weibe's address book, which was seized during the search of Weibe's residence. Finally, printed emails from Drake were recovered at the homes of Binney, Wiebe, and Loomis.

31.    In connection with this and other investigations in which I have participated, I have learned that individuals who hold security clearances typically sign agreements that they will safeguard classified information, report violations of security rules, and not disseminate classified information to uncleared persons. This matter is no exception. On August 28, 2001, Drake signed a security agreement with the NSA governing his obligations regarding "protected information," which is defined in the agreement as "information obtained as a result of my relationship with NSA which is classified or in the process of a classification determination." The security agreement, a

15

copy of which has been obtained and reviewed, states, in pertinent part:

> I understand that all Protected Information to which I may obtain access hereafter, is and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law.... I agree not to discuss matters pertaining to Protected Information except when necessary for the proper performance of my duties and only with persons who are currently authorized to receive such information and have a need-to-know... I understand the burden is upon me to determine whether information or materials within my control are considered by the NSA to be protected information, and whether the person(s) to whom disclosure is to be made is/are authorized to receive it.

In the agreement, Drake also acknowledged that the unauthorized disclosure of "protected information" may constitute a violation of one or more of the following statutes – Sections 793, 794, 798, or 952 of Title 18, United States Code, and sections 421 through 426 and 783(b) of Title 50, United States Code.

32.     The security agreement also contained a provision regarding the return of "protected information," underscoring its contraband nature if it is maintained in an uncleared space such as a person's home, personal computer, and/or unsecured personal email account:

> I do not now, nor will I ever, possess any right, interest, title, or claim whatsoever to such information. I agree that upon demand by an authorized representative of the NSA or upon the conclusion of my authorized access to Protected Information, I shall return all material concerning such Protected Information in my possession, or for which I am responsible because of such access. I understand that failure to return such items may be a violation of Section 793 of Title 18, United States Code, and may constitute a crime for which I may be prosecuted.

### 3.     The Unauthorized Disclosure Of Classified NSA Information To A Member Of The Media

16

33.     On May 18, 2006, an article was published in The Baltimore Sun, titled *NSA Rejected System That Sifted Phone Data Legally*, by Siobhan Gorman, which championed THIN THREAD over the "sudden White House expansion of [NSA's] surveillance powers," contemplated by the TSP.  During an interview of a former high-ranking FBI official in connection with this investigation, that official stated that before publication of the May 18, 2006 story, Gorman contacted her and asked for information about the TSP, specifically identifying it by the initials of the covername for the TSP. Although the Gorman article itself did not contain classified information, the questions she asked the FBI official and the information set forth below strongly suggest that Gorman's source or sources for her THIN THREAD/TSP story related classified TSP information to her.

34.     In that regard, Binney explained to the FBI that shortly before publication of the May 18, 2006 article, Roark called Binney from her home in Oregon and told him she was talking to Gorman and that Gorman was working on an article about THIN THREAD.  According to Binney, Roark further explained that the article was going to highlight her assertion that THIN THREAD was cheaper than the TSP and had encryption features that the TSP did not have – issues that Roark previously had raised with HPSCI members and General Hayden.  Roark also asked Binney if he would talk to Gorman, but he declined.

35.     Binney has further advised the FBI that during the same conversation, Roark asked him if the "testing" he had done on the THIN THREAD program occurred in 1998, and Binney confirmed that it had.  Roark concluded the conversation by asking Binney to email her the thirteen-page summary of THIN THREAD that she, Binney,

Loomis, Wiebe, and Drake had created in 2002 and which contained details about the architecture of THIN THREAD. According to Binney, he still had the document on his computer and emailed it from ▆▆▆▆@verizon.net, his personal email address on his home computer, to Roark's personal email address on her home computer, with copies to Loomis and Wiebe at their personal email addresses on their home computers. On July 26, 2007, during the court-authorized search of his residence, Binney also advised the FBI that before the summary was sent to Roark in May 2006, he, Roark, and Wiebe exchanged additional email communications, using their respective personal email accounts, about Roark's request and the summary.

36.     When asked about the May 18, 2006 article by the FBI, Binney admitted that his answer to Roark's question about testing THIN THREAD in 1998 appeared in the article. Likewise, he admitted that the article's discussion of "four cutting-edge surveillance tools" seems to be directly lifted from the thirteen-page THIN THREAD summary he provided to Roark. I believe that this suggests, at a minimum, that Roark read portions of the summary to Gorman. Moreover, she may have provided the entire document to Gorman by hand, fax or email. According to Binney, before he sent the THIN THREAD summary to Roark, she asked if he and Loomis would review the document to confirm it was unclassified. Binney then confirmed that he and Loomis believed it was unclassified. While this facially suggests that Roark was sensitive to classification issues, it is worth noting that she, Binney and Loomis were no longer employed by the federal government, were not classification authorities, were fully aware of the appropriate procedure for seeking classification determinations, and never sought

18

review of the document by the NSA before transmitting it through unsecure channels and sharing it with an uncleared member of the media.

37.     As noted previously, Drake appears to share Roark's views regarding the differences between THIN THREAD and the TSP.  In that regard, on November 21, 2005, Drake sent an email to the Director of NSA, General Keith Alexander, in which he outlined his views on the injustices that had occurred regarding THIN THREAD, and how easy it would be to put THIN THREAD back into action.  Drake pleaded for "top cover" and admitted he was going outside of his management chain in writing the email. General Alexander replied to Drake's email saying that THIN THREAD was tested and found "wanting."  After this communication, Drake was reassigned to the NDU, a transfer that he has told others he believes was punishment for his criticism of TSP.

38.     In addition to the foregoing, evidence adduced during the investigation suggests that Drake has encouraged Roark to disseminate her views regarding classified programs to members of the media without clearing her submissions through classification review channels.  In that regard, on August 22, 2006, Drake was involved with Roark, Binney, Wiebe, and Loomis in an email exchange, a copy of which was obtained and reviewed pursuant to the July 26, 2007 searches, on whether Roark needed to meet her duty to submit a draft op ed to the pre-publication boards at CIA and NSA for a classification review. Drake's response to Roark was "you really want to get tied up in the whole review process?! Potentially could take months!" Drake then added that NSA could block it out of spite, and said "...there are 'other' ways of getting this truth out if CIA/NSA balk." In another exchange with Roark, Drake wrote, "Diane, Are you absolutely bound to have this go through formal CIA or even NSA review, PRIOR to

19

individuals accessed, via internal NSA internet, the internal documents used by Gorman to publish her story, and Drake was one of those individuals. Additionally, Drake was the only individual who accessed both the TAG documents and the documents used for the blog by Gorman.

43.     The investigation has further determined that Drake continues to use his personal email account, ▮▮▮▮▮:@earthlink.net, to engage in email exchanges about NSA-related programs with Binney, Wiebe, Roark, and Loomis. In fact, on June 27, 2007, Drake emailed Binney, Wiebe, Roark, Loomis, and another former NSA employee and disclosed that the name of an existing NSA program had been changed. That email also was obtained and reviewed pursuant to the aforementioned searches.

44.     More recently, since the July 26, 2007 searches, Drake has been observed engaging in additional suspicious behavior when he visits NSA. For example, on August 3 and August 13, 2007, Drake logged on to NSA classified and unclassified computer systems and printed several emails and documents. Thereafter, on September 10, 2007, after logging onto a classified computer system, he was again observed printing several documents from his NSA computer, although the investigation has determined that these documents were not classified. Drake was then seen rolling up the documents, walking out of the NSA office space to his car, and placing the documents in the glove box of his vehicle, where they would not be visible to others.

## IV.     PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

### A.     Drake's Residence

45.     The investigation has established that ▮▮▮▮▮▮▮▮▮▮▮, Glenwood, Maryland, is Drake's primary residence. The property is a two-story, single family home

22

such contact/address information for "ready-reference," in order to be able to make and return phone calls or otherwise maintain contact with current or former business and professional contacts. Such records serve as an information source or basis for ongoing or future contacts. In this particular case, for example, a rolodex, dayplanner, datebook, address book, and other similar types of documents referenced in Attachment D will be particularly probative because they may provide evidence of contacts, communications, appointments, and/or meetings by and between the subjects, members of the media and others.

48.     Additionally, I believe there is probable cause to believe that Drake would also maintain in the premises to be searched the modern-day electronic business tools which one uses to maintain contact with business associates and others and keep appointments: a personal computer, a laptop or notebook computer, facsimile machine, a personal digital assistant, an electronic organizer, an electronic calendar, or a similar device. Moreover, searches of the residences of Roark, Binney, Wiebe and Loomis resulted in the recovery of email messages reflecting that Drake sent and received email messages at "██████@earthlink.net," Drake's personal email address. Based on my experience, I believe there is probable cause to believe that email address books on Drake's personal computer(s) will likely contain email addresses and or other identifying information for the business associates and other contacts with whom he has maintained, or continues to maintain, email communication, including, but not limited to, Roark, Binney, Wiebe, and Loomis. My experience with most email programs and email address books also suggests that in many instances, even if an individual writes to another individual on only one occasion, the email address listed in the "to" portion of the

email message will be automatically registered into the sender's email address book. Even if the sender never again sends a message to that individual, the sender's email address book will likely continue to preserve the recipient's email address for a future occasion when the sender contemplates emailing a message to that address.

49.     Based on my experience, I also believe there is probable cause to believe that Drake currently possesses other materials in the premises to be searched and on his personal computer(s), such as files, newspaper clippings, newspaper articles, books or other reading material, photographs, email messages, or other documents and material regarding THIN THREAD, the TSP or related matters, as well as evidence of conversations, meetings, and/or other contact about these subjects. Accordingly, I request authorization to seize and search all such computers and related devices, as described in Attachment D, in order to obtain information and evidence that is within the scope of the requested search.

50.     Based on my experience, I also know that individuals who use cellular telephones, cordless telephones, and hard line telephones often enter the other party's phone number into the memory or address book on their telephone, provided those telephones have a memory and/or phone book feature. Moreover, depending on how recently a call was made or received, the telephone itself may contain a listing of calls made to and from that phone. Accordingly, in connection with the requested search, I also seek permission to seize such telephones for further analysis, as these items, too, may yield evidence of telephone contact by and between the subjects and others connected to the events described in this affidavit.

**Drake's NDU Office**

51.     In addition to the foregoing, Drake has been observed carrying a lap top computer bag to and from his NDU work office and home. The investigation has also confirmed that NDU issued Drake a lap top computer, and his NDU office space has a docking station for his lap top computer when Drake is at his office.  NDU security officials have advised that on one very recent occasion when Drake was not at work Drake's lap top computer was observed in his office in a docking station on his work desk. The lap top docking station provides internet access by a cable modem.

52.     Through grand jury subpoenas issued to EarthLink, as well as discussions with EarthLink representatives, Drake's account activity for the personal email account "███:@earthlink.net" was obtained and reviewed for the period Monday, October 22, 2007, through Friday, November 2, 2007. According to the EarthLink representative and the documents obtained, Drake has not logged on from his home EarthLink dial-up service since early July of this year, approximately a few weeks before the above-described search warrants were executed.   However, it appears that Drake has nonetheless continued to check his EarthLink emails from work, using the laptop computer he brings to NDU from home. This is confirmed by Drake's EarthLink account login records for the following recent, representative time periods:

| Date | Drake EarthLink Email Account Login Times |
|---|---|
| Monday, October 22, 2007 | 11:41 am, 3:32 pm |
| Tuesday, October 23, 2007 | no logins<br>(Drake was scheduled to teach a class from 1:30pm – 3:25 pm) |

| Date | Drake EarthLink Email Account Login Times |
|---|---|
| Wednesday, October 24, 2007 | 1:26 pm, 3:58 pm<br>(Drake scheduled to teach class from<br>1:30 pm – 3:25 pm) |
| Thursday, October 25, 2007 | no logins |
| Friday, October 26, 2007 | 11:44 am, 4:07 pm, 10:57 pm |
| Saturday, October 27, 2007 | no logins |
| Sunday, October 28, 2007 | no logins |
| Monday, October 29, 2007 | 12:44 pm, 12:55 pm, 1:18 pm |
| Tuesday, October 30, 2007 | 1:34 pm, 1:40 pm, 2:10 pm<br>(Drake was scheduled to teach a class from<br>3:35 pm – 5:30 pm) |
| Wednesday, October 31, 2007 | no logins<br>(Drake was scheduled to teach a class from<br>3:35 pm – 5:35 pm) |
| Thursday, November 1, 2007 | 7:47 am, 7:52 am, 8:03 am, 8:17 am, 8:34 am,<br>3:31 pm, 3:36 pm |
| Friday, November 2, 2007 | 7:40 am, 7:45 am, 7:52 am, 8:25 am, 8:30 am,<br>8:39 am, 8:52 am, 9:02 pm |

As these representative log-in records suggest, during the work week, Drake may be routinely and frequently checking his EarthLink email from his NDU office space, using the internet access NDU provides there, except when he is either away from the office, or engaged in teaching responsibilities.

53.     Drake's out of office email message at NSA directs people to contact him at his NDU.edu email address.  Moreover, emails recovered from at least one computer searched pursuant to the July 26, 2007 warrants indicate that Drake also uses his NDU email address and NDU lap top computer to maintain communications with Binney,

27

Wiebe, Roark, and Loomis on various topics. For instance, in a November 14, 2006 email to Binney, Wiebe, Roark, and Loomis, concerning the subject, "Very sobering take on Iraq-what went wrong," Drake sent from his ~~NDU~~ *Earthlink* email account the following message: "Gang. See below. Passed on via my NDU network." Drake signed the email "Tom." Notably, pasted below his signature is his NDU office address, telephone number, and email address of ▮▮▮▮@ndu.edu.

54.    Accordingly, since Drake apparently has EarthLink and NDU email access while at NDU, Drake, like any laptop user, is likely to also maintain on his lap top computer and in his NDU office space relevant files he sends by email, documents he consults in drafting emails, and possibly also hardcopies or printouts of emails and documents from his lap top computer. Because Drake has no office space at any other NSA facility, such materials would be reposed at his office at NDU or at home.

55.    Furthermore, as recently as October 15, 2007, Drake has been observed coming to NSA Headquarters in the morning, printing NSA documents off the internal NSA intranet, and then reporting to work at NDU in the afternoon. Also, Drake has been observed printing off NSA information from NSA Headquarters at the end of the workday, only to return to NDU the next morning. Considering that reporter Gorman works and resides in Washington, D.C., and investigative interviews have revealed that Gorman meets her sources in-person at locations in Washington, D.C., Drake may retain in his NDU office information that he delivers to Gorman in person.

### C.    Drake's Vehicle

56.    As explained above, Drake was observed on September 10, 2007 printing unclassified documents from his NSA computer, rolling up the documents, walking out

28

of the NSA space, and placing the documents in the glove box of his vehicle. In my experience, classified and/or sensitive documents are sometimes secretly removed from government facilities through the use of car. In recent significant espionage cases, for instance, individuals who illegally disclosed classified and sensitive information to others were observed keeping classified and sensitive documents and information in places in their car, such as the trunk, where the documents would not be visible to others. Thus, based on my experience, and given the suspicious behavior in which Drake engaged on September 10, 2007 while at NSA Headquarters, I also believe that there is probable cause to believe that Drake may also possess NSA papers or other materials, classified and unclassified, in his car, as well as in his home and office. Accordingly, I also seek permission to search Drake's vehicle, in which he was observed placing documents obtained from NSA on September 10, 2007. Maryland Department of Motor Vehicles, Motor Vehicle Administration (MVA), records reflect that Drake is the registered owner of a 2006 Toyota Hybrid Prius, sage green in color, Maryland tag ████████, VIN number ████████████████. MVA records also reflect that the car is registered to Thomas Andrews Drake, Operator License Number ████████████, D.O.B. ████████, residing at ████████████, Glenwood, Maryland 21738.

## V.    SEARCH PROCEDURES FOR SEARCH OF COMPUTER DATA

57.    Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy drives, compact disks, magnetic tapes, memory chips, and the like. I also know that searching computerized information for evidence or instrumentalities of a

crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true for the following reasons:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted; and

c.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such

as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

58. In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ some or all of the following procedures:

a. Law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will assist with the search of the computers and other electronic media referenced herein to determine whether these items contain any evidence and instrumentalities of violations of federal law. The computers and other electronic media referenced herein will be reviewed by appropriately trained personnel and the case investigators in order to extract and seize any data within the scope of the search warrant; and

b. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and

possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

59.     In searching the data, the computer personnel and case investigators may examine all of the data contained in the computers and other electronic media referenced herein to view their precise contents and determine whether the data is relevant to the investigation. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data is relevant to the investigation.

60.     As noted above, the classified THIN THREAD summary initially was created by the subjects in their homes and exchanged via personal email in 2002. Drake received copies of the classified THIN THREAD summary via personal email. Additionally, in 2006, Loomis was involved in additional email communications concerning the summary. Finally, in May 2006, when the summary was emailed to Roark, who appears to have disclosed the classified THIN THREAD summary to Siobhan Gorman at The Baltimore Sun, Loomis was copied on the email. Prior to the FBI searches in July 2007, Binney, Wiebe, and Loomis were engaged in that business activity. Accordingly, because the document and related materials were created for a business purpose, and because Binney, Wiebe, and Loomis were recently engaged in that business activity, I believe there is probable cause to believe that the documents have been retained by Drake and will be found at his residence, including on any personal computer(s) in his possession. Even if the electronic documents have been "deleted,"

however, it is my understanding that they can recovered through technologies available to those who conduct such searches.

61.     Based on my knowledge, training, and experience, including the experience of other agents with whom I have spoken, I am aware that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## VII.   CONCLUSION

62.    Based upon the evidence set forth herein, which I believe to be truthful and reliable, as well as my investigative experience, I believe that probable cause exists to believe that Thomas Drake has engaged in the unauthorized disclosure of classified documents or materials to other persons not authorized to receive it, including at least one member of the media, in violation of Title 18, United States Code, Sections 793 (Unlawful Disclosure of Classified National Defense Information), 798 (Unlawful Disclosure of Classified Information), and 371 (Conspiracy To Commit An Offense Against The United States).   I further submit that a search of the above-described premises and containers therein will result in the seizure of items listed in Attachment D that may constitute the evidence, instrumentalities, or fruits of these offenses.

Christine A. Botz, Special Agent
Federal Bureau of Investigation

**NOV 21 2007**

Subscribed and sworn to before me
on this _____ day of November, 2007

The Hon. John M. Facciola
United States Magistrate Judge
District of Columbia

34